# In the United States Court of Federal Claims

No. 11-700 C

(E-Filed Under Seal:  December 19, 2011)[1]
(Filed with Redaction:  January 6, 2012)

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| BROOKS RANGE CONTRACT | ) | |
| SERVICES, INC., | ) | Bid Protest; Motion to Dismiss; |
| | ) | Cross-Motions for Judgment on |
| Plaintiff, | ) | the Administrative Record |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| URBAN SERVICES GROUP, INC., and | ) | |
| MERIDIAN MANAGEMENT CORPORATION | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

Johnathan M. Bailey, San Antonio, TX, for plaintiff.

---

[1]  This Opinion was filed under seal on December 19, 2011.  The court directed that, if any party believed that the December 19, 2011 Opinion contained protected material that should be redacted before publication, that party shall, by motion filed on or before Tuesday, December 27, 2011 at 12:00 noon Eastern Standard Time, request that such protected material be redacted. Plaintiff did not propose any redactions.  On December 21, 2011, in response to the court's directive, defendant filed a motion (defendant's Motion) requesting redactions of the actual identities of each unsuccessful offeror except the plaintiff and noting that the reference to "Mr. Len Wilson" that was quoted on page fourteen should be corrected to state "Ms. Len Wilson." Def.'s Proposed Redactions for December 19, 2011 Order, Dkt. No. 34.  Defendant's Motion is GRANTED.  The court substitutes generic identifiers for the unsuccessful offerors (except for plaintiff) and changes the reference to Len Wilson on page fourteen to "[Ms.] Len Wilson."

<u>Devin A. Wolak</u>, with whom were <u>Tony West</u>, Assistant Attorney General, <u>Jeanne E.</u>
<u>Davidson</u>, Director, <u>Reginald T. Blades, Jr.</u>, Assistant Director, and <u>Ryan M. Majerus</u>, of
counsel, Commercial Litigation Branch, Civil Division, United States Department of
Justice, Washington, DC, for defendant.  <u>Leigh Ann Bunetta</u>, Regional Counsel for the
General Services Administration, Denver, CO, of counsel.

<u>Michael A. Gordon</u>, Washington, DC, for defendant-intervenors.  <u>Fran Baskin</u>,
Washington, DC, of counsel.

OPINION

HEWITT, Chief Judge

 This is a post-award bid protest brought by plaintiff Brooks Range Contract
Services, Inc. (Brooks Range or plaintiff).  Plaintiff challenges the award of a contract for
building management services at two federal buildings in Colorado to defendant-
intervenors Urban Services Group, Inc. and Meridian Management Corporation (Urban
and Meridian or intervenors).  <u>See generally</u> Compl.

 Before the court are plaintiff's Verified Complaint for Declaratory and Injunctive
Relief (Complaint or Compl.), Docket Number (Dkt. No.) 1, filed October 24, 2011;
Plaintiff's Motion for Judgment upon the Administrative Record, Dkt. No. 26, attached to
which is Plaintiff's Memorandum in Support of Motion for Judgment upon
Administrative Record (plaintiff's Memorandum or Pl.'s Mem.), Dkt. No. 26-1, filed
November 8, 2011; Defendant's Motion to Dismiss, Cross-Motion for Judgment upon the
Administrative Record, and Response to Plaintiff's Motion for Judgment upon the
Administrative Record (defendant's Combined Motion or Def.'s Combined Mot.), Dkt.
No. 27, filed November 15, 2011; Intervenors' Cross-Motion for Judgment on the
Administrative Record (intervenors' Cross-Motion or Ints.' Cross-Mot.), Dkt. No. 28,
filed November 15, 2011; Plaintiff's Response to Defendant's and Intervenor[s'] Motion
for Jud[g]ment on the Administrative Record (plaintiff's Response or Pl.'s Resp.), Dkt.
No. 29, filed November 18, 2011; Defendant's Reply in Support of Its Motion to Dismiss
and Motion for Judgment upon the Administrative Record (Def.'s Reply), Dkt. No. 30,
filed November 21, 2011; and Intervenors' Reply to Plaintiff's Response to Defendant's
and Intervenors' Motion for Judgment on the Administrative Record (Ints.' Reply), Dkt.
No. 31, filed November 21, 2011.

 Defendant filed the Administrative Record (AR), Dkt. No. 23, on November 1,
2011.  The parties completed briefing on November 21, 2011 and the court held oral

argument on the motions telephonically on Tuesday, November 22, 2011 at 11:00 a.m. Eastern Standard Time.[2] See Order of Oct. 24, 2011, Dkt. No. 14, at 2.

I.      Background

        A.      Sources Sought Announcement and Solicitation

        On May 5, 2011, the General Services Administration (GSA or the agency) issued Solicitation No. GS-08P-11-JB-C-0028 (Solicitation) for building operations and maintenance, custodial and groundskeeping services at the David Skaggs Research Center in Boulder, Colorado, and the Fort Collins Federal Office Building in Fort Collins, Colorado. AR Tab 3A (Solicitation) 19. The Solicitation required offerors to submit proposals by June 8, 2011. Id. at 24.

        The original Solicitation was limited to FSS 03FAC schedule holders. Before issuing the Solicitation, GSA issued a "Sources Sought" announcement on eBuy, see AR Tab 17 (Apr. 20, 2011 Note to File) 383, for operations and maintenance, custodial services, and groundskeeping services at two federal facilities in Colorado, AR Tab 15 (Sources Sought Announcement) 372. The Announcement stated, "This procurement will be open only to companies currently on contract under GSA FSS Schedule 03FAC/811 002 Complete Facilities Maintenance. Solicitation packages will be made available only to qualified companies that have responded to this Sources Sought Synopsis." Id.[3]

        Twenty-five companies responded to the Sources Sought announcement. AR Tab 17 (Apr. 20, 2011 Note to File) 383. Plaintiff and defendant-intervenors were among eleven contractors selected by the government to receive requests for proposals. Id.

        Proposals were to be evaluated on a best-value basis. AR Tab 3A (Solicitation) 24. The original Solicitation required the evaluation of three factors: price, technical capabilities and past performance. Id. The Solicitation stated:

---

[2] The oral argument held on Tuesday, November 22, 2011 was recorded by the court's Electronic Digital Recording (EDR) system. The times noted in citations to the oral argument refer to the EDR record of the oral argument and, in some cases, may not correspond exactly to the time at which the proceeding was held.

[3] In addition, the Federal Acquisition Regulations (FAR) provide that when an agency "plac[es] orders under Federal Supply Schedule contracts using the procedures of [FAR] 8.405, ordering activities shall not seek competition outside of the Federal Supply Schedules or synopsize the requirement." FAR 8.404(a).

Price is of the single greatest importance.  Technical Capabilities is weighted significantly more important than Past Performance.  Technical Capabilities and Past Performance factors, when combined, are weighted slightly more important than Price.  Using this criteria, award will be made to the Offeror having the highest combined Technical Capabilities and Past Performance rating possible representing the best value when compared to any lower priced offeror.

Id.

B.      Amendments 001 and 002

Prior to the submission deadline of June 8, 2011, GSA issued two amendments to the Solicitation, Amendment 001 and Amendment 002.  AR Tab 3B (Amendment 001); AR Tab 3C (Amendment 002).  Amendment 001 added "small business status" to the proposal evaluation factors and changed the description of how the non-price factors are to be weighted.  AR Tab 3B (Amendment 001) 215.  The amended description stated, "Proposals will be evaluated on Price, Technical Capabilities, Small Business Status, and Past Performance.  Small Business Status is equal in weighting to Past Performance.  Technical Capabilities is weighted approximately twice as important as either Small Business Status or Past Performance.  Non-price factors, when combined, are more important than price."  Id.

Amendment 002 incorporated a question-and-answer exchange with offerors.  AR Tab 3C (Amendment 002) 218 ("Contract Questions and Answers . . . is incorporated into the solicitation").  The questions and answers included an exchange regarding joint ventures.  AR Tab 3C (Amendment 002) 230.  Question 87, reflecting an inquiry by Urban and Meridian about submitting a proposal as a joint venture, AR Tab 28 (May 17, 2011 email exchange between Tannis Taylor and Cheryl Ansaldi) 1484, asked, "Can a large business schedule holder form a joint venture with a small business schedule holder and receive small business evaluation credit?", AR Tab 3C (Amendment 002) 230.  The answer stated, "A joint venture would have to be considered a separate legal entity.  Even if both parties were on Schedule, the joint venture itself, would not be considered a Schedule holder."  Id.  The answer noted, however, that "a large business schedule holder may form a Contractor Teaming Agreement [(CTA or Teaming Agreement)] with a qualified small business schedule holder and receive the small business evaluation credit."  Id.

C.      GSA Guidance on CTAs

4

The GSA website provides guidance regarding CTAs.  One GSA webpage titled
"Schedule 03FAC User FAQ" explains "A GSA Schedule Contractor Team Arrangement
(CTA) is an arrangement between two or more GSA Schedule contractors to work
together to meet agency requirements."  AR Tab 3I (GSA Online Guidance) at 280,
available at http://www.gsa.gov/portal/content/230689.  The GSA webpage explains that
the CTA documents are "solely between the team members," and that "GSA strongly
encourages the submission of the CTA document in response to a Request for Quotation
(RFQ), so that an ordering activity may gain an understanding of how the arrangement
will work, and may identify any areas of responsibility that may require clarification."
Id. at 287, available at http://www.gsa.gov/portal/content/202257.
GSA does not provide a sample GSA Schedule CTA; it is expected that CTA documents
"will vary from one CTA document to another."  Id.

Another GSA webpage, titled "Elements of a CTA Document" provides somewhat
more detailed guidance, stating, for example, that the CTA document "should" list the
types of activity covered by the arrangement, specify the duration of the team
arrangement, "specify and describe the individual duties of the team members," specify
rates and pricing, establish liability, and "should state that all team members remain
independent contractors, responsible for their own employees."  AR Tab 3I (GSA Online
Guidance) 283-84, available at http://www.gsa.gov/portal/content/202253.  The GSA
webpage also states, "The CTA document should not create a joint venture or separate
subsidiary."  Id. at 284.

D.     Proposals

Five offerors, including Urban and Meridian and Brooks Range, submitted timely
proposals.  See AR Tab 22 (CO's Proposal Analysis) 1345; AR Tab 19 (Urban and
Meridian's Proposal) 391; AR Tab 21 (Brooks Range's Proposal) 1149.  Urban and
Meridian's proposal contained a draft CTA.  AR Tab 19 (Urban and Meridian's Proposal)
399-413.  A version of the draft CTA with minor changes was executed by
representatives of both Urban and Meridian on June 28, 2011.  AR Tab 3E (executed
CTA) 260.  Urban and Meridian's draft CTA and the later executed version, form the
basis of plaintiff's Complaint.  See generally Compl.

Both the draft CTA and the executed CTA are titled "Urban Services Group,
Inc./Meridian Management Corporation Teaming Agreement."  AR Tab 19 (Urban and
Meridian's Proposal) 399, AR Tab 3E (executed CTA) 249.   The first few pages of the
CTAs contain provisions and references that appear to conform to the GSA guidance
regarding CTAs.  For example, both CTAs state, "The parties hereto hereby associate
themselves as team members for the purpose of performing and completing the Work
contemplated by the Contract."  AR Tab 19 (Urban and Meridian's Proposal) 400; AR

5

Tab 3E (executed CTA) 250.  Additional provisions contemplate, among other things, a single bank account held in the team's name and the purchase of property in the name of the team and provide that neither member could withdraw from the team.  AR Tab 19 (Urban and Meridian's Proposal) 405-409; AR Tab 3E (executed CTA) 255-58.

E.     Evaluation and Award

An agency acquisition team, composed of the contracting officer and the six-member technical review board (TEB), reviewed the proposals.  See generally AR Tab 22 (Proposal Analysis); Tab 23 (CO's Notes); Tab 24 (TEB Report); Tab 25 (TEB Worksheets); Tab 26 (Past Performance Worksheets); see also AR Tab 18 (Evaluation Process) 388.  Contracting officer Tannis Taylor (CO or Ms. Taylor) conducted an initial review of proposals, AR Tab 23 (CO's Notes) 1351; the TEB then conducted a technical review, AR Tab 24 (TEB Report) 1354; then Ms. Taylor determined that Urban and Meridian would "result in the greatest overall benefit to the Government in response to the requirements," AR Tab 22 (CO's Proposal Analysis) 1350.

The Solicitation described how the agency was to weigh price and non-price factors.  It stated:

> Proposals will be evaluated on Price, Technical Capabilities,[4] Small Business Status, and Past Performance.  Small Business Status is equal in weighting to Past Performance.  Technical Capabilities is weighted approximately twice as important as either Small Business Status or Past Performance.  Non-price factors, when combined, are more important than price.

AR Tab 3B (Amendment 001) 215 (footnote added).

In the agency's evaluation of non-price factors, plaintiff Brooks Range received one "adequate," three "good" and one "exceptional" ratings in the five technical subcategories.  See AR Tab 22 (CO's Proposal Analysis) 1348.  Plaintiff's past performance also earned a "good" rating.  Id.  Plaintiff did not receive Small Business Status evaluation credit.  See AR Tab 24 (TEB Report) 1354.  Intervenors, Urban and Meridian, received one "adequate," two "good" and  two "exceptional" ratings in the five technical subcategories.  See AR Tab 22 (CO's Proposal Analysis) 1348.  Intervenors also received a "good" past performance rating and Small Business Status evaluation credit (based on their CTA).  See id.; AR Tab 23 (CO's Notes) 1352.  [Offeror X], a third offeror that becomes relevant when assessing plaintiff's standing for this bid protest,

---

[4]  Technical capabilities were evaluated through five subcategories.  See AR Tab 3A (Solicitation) 25; AR Tab 22 (CO's Proposal Analysis) 1348.

received two "marginal" and three "good" ratings in the five technical subcategories.  AR Tab 22 (CO's Proposal Analysis) 1348.  [Offeror X] received an "adequate" rating for its past performance, and it, too, received Small Business Status evaluation credit.  Id.

The contracting officer also examined the prices of each offeror in relation to each other and to an independent government estimate (IGE).  Id.  Urban and Meridian, [Offeror X], and Brooks Range all submitted offers priced below an IGE of $14,326,963.70.  Id.  Of these three offerors, Brooks Range submitted the highest total price ($13,630,971.71), Urban and Meridian submitted the next highest ($13,300,872.00), and [Offeror X] submitted the lowest ($12,575,760.00).  Id.

The agency then made an award "without contractor discussions, and without negotiations."  Id. at 1343.  The contracting officer's proposal analysis states, "Evaluation credit was given for Small Businesses and Large Businesses operating with a Small Business partner under a [CTA]" and "Prices were checked for clerical accuracy and compared against the Government Estimate/Opinion of Probabl[e] Cost for realism."  Id. at 1345.  Urban and Meridian's proposal was "determined to offer the best value to the Government," AR Tab 22 (CO's Proposal Analysis) 1349; and offerors were so notified on June 27, 2011, AR Tab 29 (Award Email) 1485.  The government awarded the contract to Urban and Meridian on July 1, 2011.  AR Tab 3F (Award Letter) 264 (stating that the "task order is hereby issued to the contractor team of [Urban and Meridian] in the amount of $13,300,872").

F.       Agency Inquiry and GAO Protest

On July 8, 2011, following award of the contract to intervenors, plaintiff emailed the agency to ask whether Urban and Meridian had received the contract as a joint venture or as a prime contractor-sub contractor ("prime-sub") relationship.  AR Tab 3H (GAO Protest) 272.  The contracting officer replied to plaintiff by email on July 11, 2011, stating that the contract "was awarded to Meridian and Urban under a Contractor Teaming Arrangement in which Urban is the majority partner."  Id.  The contracting officer replied further that "[w]e would not have accepted a joint venture situation unless the jv itself (not just the partners) were on schedule."  Id.  In a follow-up email on July 11, 2011 Brooks Range asked the contracting officer to "clarify who the Prime contractor was, Urban or Meridian."  Id. at 273.  The contracting officer replied by email a few hours later, stating, "It's not a prime/sub relationship.  The contract was awarded to the team, subject to the terms of their CTA."  Id.

On July 11, 2011 plaintiff filed a protest at the Government Accountability Office (GAO).  See AR Tab 3H (GAO Protest) 270-76.  Brooks Range alleged that "the agency's award of the delivery order is to an entity that does not have a FSS 03FAC

7

Schedule Contract and the Solicitation was limited to FSS 03FAC Schedule Contract Holders." Id. at 270.  GSA filed its agency report on August 11, 2011.  AR Tab 3 (Agency Report) 11.  GAO denied plaintiff's protest on October 12, 2011.  See AR Tab 12 (GAO Order) 339, 343.  GAO stated that the "Urban/Meridian submission in response to the solicitation was specifically identified as a teaming agreement for the purpose of providing services in response to the solicitation."  Id. at 343.

> G.    Proceedings Before This Court

On October 24, 2011 Brooks Range filed its protest in this court.  See generally Compl.  In its briefing, plaintiff contends that:  (1) the Solicitation, as amended by Amendment 002, prohibited an award to a joint venture that was not a schedule holder; (2) Urban and Meridian formed a joint venture that was not a schedule holder; and (3) the agency made the award to Urban and Meridian in violation of its Solicitation and GSA requirements.[5]  See Pl.'s Mem. 24, 35-36.  Defendant counters, first, that plaintiff does not have standing to bring an action within this court's jurisdiction under 28 U.S.C § 1492(b)(1).  Def.'s Combined Mot. 11.  Defendant further contends that the contracting officer's actions were reasonable, id. at 16-23, and that the Urban and Meridian CTA does not violate any GSA requirements, id. at 23-24.

II.    Legal Standards

> A.    Standing

---

[5]  Plaintiff also argued that a "contractor team relationship" may only be a prime-sub contractor relationship or a "partnership/joint venture" and, since the Urban Services Group, Inc. and Meridian Management Corporation (Urban and Meridian) relationship is not a prime-sub relationship, it must be a "partnership/joint venture."  Plaintiff's Memorandum in Support of Motion for Judgment upon Administrative Record (Pl.'s Mem.), Docket Number (Dkt. No.) 26-1 at 26 (citing FAR 9.601).  To the extent that plaintiff's argument challenges the Solicitation's use of contractor teaming agreements (CTAs) to create a third type of entity in violation of the FAR, that argument is waived under Blue & Gold Fleet, L.P. v. United States.  492 F.3d 1308, 1313-15 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [United States] Court of Federal Claims.").  A General Services Administration (GSA) reference manual provides the following (very) limited guidance:  "Do not confuse Schedule Contractor Team Arrangements with the definition of [CTAs] found in FAR Subpart 9.6.  None of the definitions (the partnership/joint venture, or the prime/sub relationship) outlined in FAR Subpart 9.6 apply to Schedule CTAs."  Administrative Record (AR) Tab 9A at 328; see also U.S. General Services Administration, Multiple Award Schedules Desk Reference Version 4 (MAS Desk Reference) 77 (2011).

The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b)(1) (2006), confers jurisdiction on this court:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  The court may "entertain such an action without regard to whether suit is instituted before or after the contract is awarded." Id.

As a threshold matter, a plaintiff must establish standing by showing that it is an "interested party" within the court's section 1491(b)(1) bid protest jurisdiction.  See Rex Serv. Corp. v. United States (Rex), 448 F.3d 1305, 1307 (Fed. Cir. 2006); Info. Tech. & Applications Corp. v. United States (Info. Tech.), 316 F.3d 1312, 1319 (Fed. Cir. 2003).  To accomplish this, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has stated that a plaintiff must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest."  Rex, 448 F.3d at 1307 (citing Myers Investigative & Sec. Servs., Inc. v. United States (Myers), 275 F.3d 1366, 1370 (Fed. Cir. 2002)); see also Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  In order to establish a direct economic interest, the protestor "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  See Info. Tech., 316 F.3d at 1319.  Stated differently, a protestor must demonstrate how an alleged error by the government would result in "particularized harm" to the protestor.  See Labatt Food Serv., Inc. v. United States (Labatt), 577 F.3d 1375, 1380 (Fed. Cir. 2009).  In the absence of such a showing, this court lacks subject matter jurisdiction over the protest, "regardless of whether the government's conduct was arbitrary, capricious, or contrary to law." MED Trends, Inc. v. United States, No. 11-712, 2011 WL 5970954, at *4 (Fed. Cl. Nov. 30, 2011).

B.      Bid Protest Standard of Review

"A bid protest proceeds in two steps."  Bannum, Inc. v. United States (Bannum), 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The first step involves demonstrating error, that is, showing that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law.  Id.  The second step involves determining whether the error was prejudicial.  Id.

1.      The Plaintiff Must Establish Error

9

The court reviews a bid protest action under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2006); see also Bannum, 404 F.3d at 1351; Galen Med. Assocs., Inc. v. United States (Galen), 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis.  See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 43 (1983).  "The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).  In particular, the reviewing court may not substitute its judgment for that of the agency.  State Farm, 463 U.S. at 43.  The question for the court is not whether the agency is correct or whether the court would have reached the same conclusion as the agency, but whether there was a reasonable basis for the agency's actions.  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))).

Under the APA standard of review, as applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and now under the ADRA, "a bid award may be set aside if either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  Impresa, 238 F.3d at 1332.  Challenges to decisions on the basis of a violation of a regulation or procedure "must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  Id. at 1333 (quoting inter alia, Kentron Hawaii, Ltd. V. Warner, 480 F.2d 1166, 1164 (D.C. Cir. 1973)).

A court reviewing an agency action in a best-value procurement must be highly deferential.  See Advanced Data Concepts, Inc., 216 F.3d at 1057-58; Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006).  There is a "strong presumption that government officials act correctly, honestly, and in good faith

when considering bids." Savantage Fin. Servs., Inc. v. United States, 86 Fed. Cl. 700, 703 (2009), aff'd, 595 F.3d 1282 (Fed. Cir. 2010).

Moreover, a plaintiff's burden "is elevated where the solicitation contemplates award on a 'best value' basis." Id. at 503 (citing Galen, 369 F.3d at 1330). In determining whether an agency acted rationally, the court is particularly deferential to the agency's technical evaluation. L-3 Commc'ns EOTech, Inc. v. United States, 87 Fed. Cl. 656, 664 (2009); Fort Carson, 71 Fed. Cl. at 586.

2.      The Plaintiff Must Establish Prejudice

In order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that the error was prejudicial. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999). "If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed." HomeSource Real Estate Asset Servs., Inc. v. United States, 94 Fed. Cl. 466, 478 (2010) (citing Alfa Laval, 175 F.3d at 1367 (requiring that a protestor establish "significant, prejudicial error" to prevail in a bid protest)). In the context of a post-award bid protest, "the plaintiff must demonstrate 'substantial prejudice' by showing that there was a 'substantial chance' it would have been awarded the contract but for the agency's error." Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007) (quoting Bannum, 404 F.3d at 1353), aff'd in relevant part, (Weeks Marine), 575 F.3d 1352 (Fed. Cir. 2009).

C.      Rule 12(b)(1) Motion to Dismiss

Rule 12(b)(1) governs dismissal of claims for lack of subject matter jurisdiction. Rules of the United States Court of Federal Claims (RCFC) 12(b)(1). Subject matter jurisdiction is a threshold matter that a court must determine at the outset of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). When a defendant challenges this court's jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). A dismissal under RCFC 12(b)(1) "is warranted when, assuming the truth of all allegations, jurisdiction over the subject matter is lacking." Arakaki v. United States, 62 Fed. Cl. 244, 247 (2004) (internal quotation marks omitted); see also Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). "When a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute." Arakaki, 62 Fed. Cl. at 247 (citing Reynolds, 846 F.2d at 747; Indium Corp. of Am. v. Semi-

Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985)); see also 2 James Wm. Moore et al., Moore's Federal Practice § 12.30[3] (3d ed. 2004) ("[U]nlike a Rule 12(b)(6) dismissal, the court need not confine its evaluation to the face of the pleadings . . . ."). If a court determines that it does not have jurisdiction, it must dismiss the claim. See RCFC 12(h)(3).

D.      Motions for Judgment on the Administrative Record

Rule 52.1 of the RCFC provides for judgment upon the administrative record. See RCFC 52.1. A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment. Bannum, 404 F.3d at 1355; see RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). The standards and criteria governing the court's review of agency decisions in response to a motion for judgment on the administrative record under RCFC 52.1 vary depending upon the specific law to be applied in the particular case. See RCFC 52.1 Rules Committee Note (2006). Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law--the APA as interpreted and applied in binding precedent. 28 U.S.C. § 1491(b)(4); see also supra Part II.B.

III.    Discussion

A.      Plaintiff Lacks Standing

"'The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].'" Myers, 275 F.3d 1366 at 1369 (quoting Lujan v. Defenders of Wildlife (Lujan), 504 U.S. 555, 561 (1992)). To satisfy the standing requirement in a bid protest, the plaintiff must demonstrate that it is an interested party under 28 U.S.C. § 1491(b)(1). See Info. Tech., 316 F.3d at 1319. To establish that it is an interested party, a plaintiff must show both that it is a prospective or actual bidder and that there was a "'substantial chance' it would have received the contract award but for the alleged error in the procurement process." Id. The Federal Circuit has interpreted the latter requirement to mean that "the protestor's chance of securing the award must not have been insubstantial." Id. That is, the alleged error must have resulted in "particularized harm" to the plaintiff. See Labatt, 577 F.3d at 1380. A party may waive arguments that might demonstrate that it is an interested party if they are not presented in its opening brief. Cf. United States v. Ford Motor Co. (Ford), 463 F.3d 1267, 1276-77 (Fed. Cir. 2006); Novosteel SA v. United States (Novosteel), 284 F.3d 1261, 1273-74 (Fed. Cir. 2002).

In this case, plaintiff has failed on two grounds to establish subject matter jurisdiction.  First, plaintiff has waived its prejudice argument; second, plaintiff has not sufficiently alleged error that would, if proven, afford plaintiff a substantial chance to obtain the award.

      1.      Plaintiff Waived Its Prejudice Argument

      a.      Plaintiff Failed to Raise Its Prejudice Argument in Its Opening Brief

The Federal Circuit has explained that both fairness to the opposing party and to the trial court support the rule that a party waives issues not raised in its opening brief. The Federal Circuit has stated, "It is unfair to consider an argument to which the [opposing party] has been given no opportunity to respond."  Ford, 463 F.3d at 1277.  In addition, "parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief."  Novosteel, 284 F.3d at 1274; see also Becton Dickinson & Co. v. C.R. Bard, Inc. (Becton), 922 F.2d 792, 800 (Fed. Cir. 1990).  For the purpose of analyzing whether there has been a waiver in this case, it is necessary to determine which of plaintiff's filings the court should regard as plaintiff's opening brief.

To make this determination, the court examines plaintiff's two briefs in the context of this proceeding.  On October 24, 2011 the court issued a scheduling order instructing defendant to "file with the court and serve on plaintiff the Administrative Record (AR) on or before Tuesday, November 1, 2011."  Oct. 24, 2011 Order (Scheduling Order), Dkt. No. 14, at 2, filed Oct. 24, 2011.  The court then provided plaintiff the opportunity to open the briefing, id., and plaintiff did so by filing its motion for judgment on the administrative record on November 8, 2011, see generally Pl.'s Mot. Subsequently, on November 15, 2011 defendant filed a combined motion, titled "Defendant's Motion to Dismiss, Cross-Motion for Judgment upon the Administrative Record, and Response to Plaintiff's Motion for Judgment on the Administrative Record," moving the court to dismiss the case and, in the alternative, requesting that the court grant defendant's cross-motion for judgment on the administrative record.  See Def.'s Combined Mot. 1, 8-28.  Intervenors also filed their cross-motion for judgment on the administrative record on November 14, 2011.  See generally Ints.' Mot.  In its scheduling order, the court instructed plaintiff to file "its reply to defendant's response and its response to defendant's motion" on or before November 18, 2011.  Scheduling Order 2 (emphasis added).  On November 18, 2011 plaintiff filed a document titled "Plaintiff's Response to Defendant's and Intervenor's Motion for Jud[g]ment on the Administrative Record."  Pl.'s Resp. 1.  Defendant then filed its reply in support of its motion to dismiss and its motion for judgment on the administrative record on November 21, 2011.  Def.'s

Reply 10.  Intervenors also filed a reply to plaintiff's response on November 21, 2011.
See generally Ints.' Reply.

Black's Law Dictionary defines "opening brief" as "[a] party's first brief at a
given stage of a lawsuit."  Black's Law Dictionary 218 (9th ed. 2009).  Plaintiff's
Motion, to which plaintiff's Memorandum is attached, is therefore plaintiff's opening
brief in this proceeding on the administrative record.  See generally Pl.'s Mot.; Pl.'s
Mem.  Significantly, plaintiff's opening brief, which repeats large portions of its
Complaint, focuses on its argument that GSA erroneously awarded the contract to Urban
and Meridian, but fails to address any prejudice that would confer standing on plaintiff.
See Pl.'s Mem. 38-39 (alleging that GSA "failed to properly review [the CTA], failed to
note that it created a joint venture in violation of Amendment 0002, and failed to note
that the agreement also contravened multiple guidelines of the CTA program itself"
(emphasis omitted)).  Indeed, plaintiff does not even argue that it discussed standing in its
opening brief.  See Pl.'s Resp. 3 ("The simple reason it was not addressed [in plaintiff's
opening brief] is because standing was not an issue in this case until the filing of
Defendant's motion.").

Instead, plaintiff waited until its Response (and later, oral argument) to articulate
its position that it had a substantial chance to receive the award because the agency did
not rank unsuccessful offerors or perform a tradeoff analysis as between [Offeror X] and
Brooks Range, and because Brooks Range "excelled in areas where [Offeror X] . . . did
not perform well."  Id. at 5, 8; see also Oral Argument of Nov. 22, 2011, Argument of
Mr. Johnathan Bailey at 12:53:13-38 ("What I challenge is . . . the notion that the CO
bought off on the statement by [Ms.] Len Wilson, a Technical Review Board member,
that [Offeror X] had been selected over Brooks as being technically superior.  That
doesn't follow from the scores that his own panel has assessed; it doesn't follow from . . .
the numerous negative comments about [Offeror X]'s proposal that are in the record.").
By failing to raise the issue in its opening brief--here, plaintiff's Motion for judgment on
the administrative record--plaintiff has waived its right to assert that it was prejudiced by
agency error and may not later attempt to assert this challenge in subsequent briefing or
at oral argument.  See Novosteel, 284 F.3d at 1274.  Plaintiff's suggestion that
defendant's standing argument is merely "a litigation argument of counsel"--and that
absent the agency's or defendant's advising plaintiff that standing may indeed be an issue
plaintiff need not address standing in its opening brief--is unavailing.  See Pl.'s Resp. 3-4.

In this case, it is plaintiff's burden, as the party asserting federal jurisdiction, to
establish the elements of standing.  Lujan, 504 U.S. at 561; Myers, 275 F.3d at 1369.
Further, "It is a long-settled principle that standing cannot be 'inferred argumentatively
from averments in the pleadings.'"  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231
(1990) (quoting Grace v. Am. Cent. Ins. Co., 109 U.S. 278, 284 (1883)).  Moreover, a

plaintiff's burden of proof varies with the procedural context of the case.  Lujan, 504 U.S. at 561; Sierra Club v. Envtl. Prot. Agency (Sierra Club), 292 F.3d 895, 898 (D.C. Cir. 2002) (citing Lujan for the proposition that "the burden of production a plaintiff must bear in order to show it has standing to invoke the jurisdiction of the district court varies with the procedural context of the case").  While more general allegations may suffice during the pleading stage, when "the petitioner is asking the court . . . for a final judgment on the merits, based upon the application of its legal theory to facts established by evidence in the record," the requirement that plaintiff demonstrate standing is heightened.  Sierra Club, 292 F.3d at 899.  These requirements are no less applicable in the bid protest context, in which the standing requirements are "more stringent" than those applicable under Article III jurisdiction.  See Weeks Marine, 575 F.3d at 1359.

Despite having had the opportunity to review the AR and a "full opportunity," Becton, 922 F.2d at 800, to point out any agency error that prejudiced plaintiff--which would have provided plaintiff with standing--plaintiff chose not to address prejudice, and therefore standing, in its opening brief, see Pl.'s Mot. passim.  Here, where plaintiff's standing was not evident in its Complaint,[6] see Compl. passim, "we see no reason to depart from the sound practice that an issue not raised by [a plaintiff] in its opening brief . . . is waived."  See Becton, 922 F.2d at 800; Sierra Club 292 F.3d at 900 (holding that "a petitioner whose standing is not self evident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the . . . proceeding").[7]  Plaintiff may not later attempt to

---

[6]  Plaintiff states in its Complaint, "Jurisdiction in this action is conferred on this Court by 28 U.S.C. § 1491(b)(1).  This is an action by an interested party objecting to an alleged violation of statute or regulation in connection with a procurement."  Pl.'s Verified Compl. for Declaratory & Injunctive Relief (Compl.), Dkt. No. 1, at 1, filed Oct. 24, 2011.  However, plaintiff did not provide sufficient factual allegations in its Complaint--it alleged only general "irreparable harm," see Compl. 25, rather than facts showing the "particularized harm"--that would support a finding of jurisdiction under 28 U.S.C. § 1491(b)(1), see Compl. passim; Part II.A (citing Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed. Cir. 2009)).

[7]  The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has observed that the "first appropriate point" may be either in response to a motion to dismiss for lack of standing or in a petitioner's opening brief.  Sierra Club v. Envtl. Prot. Agency, 292 F.3d 895, 900 (D.C. Cir. 2002).  The D.C. Circuit later refined this point to state that if standing is not self-evident or the petitioner could not have reasonably believed that standing was self-evident, the opening brief must include a claim of standing.  Core Commc'ns, Inc. v. Fed. Commc'ns Comm'n, 545 F.3d 1, 3-4 (D.C. Cir. 2008) (noting that "[a]t no point--much less in the opening brief, as required for any element of standing that is not self-evident--does [plaintiff] show" how it was being injured by the regulation at issue); see also Int'l Bhd. of Teamsters v. Transp. Sec. Admin., 429 F.3d 1130, 1135-36 (D.C. Cir. 2005); Am. Library Ass'n v. Fed. Commc'ns Comm'n, 401 F.3d 489, 490-92 (D.C. Cir. 2005) (declining to dismiss a case and requesting

assert that it was prejudiced by agency error and therefore has standing in its reply[8] or at oral argument.

        b.      Defendant's Motion to Dismiss Did Not Provide Plaintiff With a Second Opportunity to Assert Prejudice in This Proceeding

---

post-argument briefing when the plaintiff provided a short jurisdictional statement in its opening brief and citations to the administrative record supporting its assertion and the parties "reasonably . . . concluded that petitioners' standing was self-evident, so neither party pursued the matter in their opening briefs to the court"). An early showing of standing may be even more important in bid protest cases, which this court handles on an expedited basis. Cf. Blue & Gold Fleet, L.P., 492 F.3d at 1313 (citing 28 U.S.C. § 1491(b)(3) and noting that a waiver rule furthers expeditious resolution of an action).

      While plaintiff suggests that standing may have been self-evident from the time of its agency protest, see Pl.'s Resp. to Def.'s and Ints.' Mot. for Jud[g]ment on the Administrative Record (Pl.'s Resp.), Dkt. No. 29, at 3, filed Nov. 18, 2011, or that a vague allusion made by defendant during the court's October 24, 2011 status conference provided nothing for plaintiff to respond to, Oral Argument of Nov. 22, 2011, Argument of Mr. Johnathan Bailey at 12:19:38-55, plaintiff's standing was not evident to the court or to opposing counsel. Defendant's counsel indicated during the court's status conference on October 24, 2011 that "Brooks Range is not in a position to . . . receive the award if it was to prevail here, so we might have a standing issue that could quickly dispose of this." Status Conference of Oct. 24, 2011, Statement of Mr. Devin Wolak at 3:11:15-25. When pressed by the court to articulate the standing issue, defendant stated, "Brooks Range is not second in line . . . . Their only challenge is to the eligibility of the awardee." Id. at 3:11:58-12:07.

[8] Plaintiff's final filing in this case is titled "Plaintiff's Response to Defendant's and Intervenor's Motion for Jud[g]ment on the Administrative Record," and could be construed as either a reply or a response. See generally Pl.'s Resp. However, whether plaintiff's "Response" is construed to be a response or reply brief, plaintiff has failed to address standing in its opening brief to the court, and has therefore waived it. See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005) (recognizing that briefs may serve multiple purposes but refusing to "address arguments not properly raised" in a responsive brief that also served as an opening brief for cross-appealed issues); Novosteel SA v. United States (Novosteel), 284 F.3d 1261, 1274 (Fed. Cir. 2002); Survival Systems, USA, Inc. v. United States, No. 11-534 C, 2011 WL 5904434, at *7 (Fed. Cl. Nov. 4, 2011). Plaintiff's statement at oral argument, that it did not waive a challenge to the agency's evaluation of its proposal because the argument was raised in "response to an issue that was first raised by the government in its moving papers," is therefore unavailing. Oral Argument of Nov. 22, 2011, Argument of Mr. Johnathan Bailey at 12:19:30-33.

After plaintiff filed its motion for judgment on the administrative record, defendant filed a combined motion that included a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1).  See generally Def.'s Combined Mot.

Contrary to plaintiff's arguments, defendant's Combined Motion, which, in part, points out a deficiency in plaintiff's argument in its opening brief, does not provide plaintiff with a second chance to assert its standing in this proceeding on the administrative record.  See Ford, 463 F.3d at 1276-77 (holding that plaintiff had waived its argument by failing to raise it in its opening brief on appeal); Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005) ("Although Fuji attempts to raise a specter of this repair/reconstruction argument in a footnote in its opposition brief and more fully in its reply brief, this court will not address arguments not properly raised in an Appellee's opposition brief, which also served as an opening brief for its cross-appealed issues." (citing, inter alia, Becton, 922 F.2d at 800)).[9]

2.      Plaintiff Did Not Sufficiently Allege Error or Establish that It Has a Substantial Chance of Receiving Award

In the portion of its Combined Motion seeking a dismissal of plaintiff's Complaint, defendant argues that Brooks Range does not have standing to bring this suit because Brooks Range did not sufficiently allege error in its Complaint, moving brief, or reply brief, that, if taken as true, would give plaintiff a substantial chance to obtain the award.  See Def.'s Combined Mot. 11-14; Def.'s Reply 4 ("These descriptions, although filled with Brooks Range's own gloss of the evaluators' notes . . . do not actually challenge any of those evaluations." (footnote omitted)).  Defendant asserts that a summary prepared by the TEB, which determined that "[Offeror X] and Urban/Meridian overall ratings were more acceptable than [that of] the other offerors," indicates that [Offeror X], rather than Brooks Range, would have been second in line for the award. Def.'s Combined Mot. 11.  Accordingly, defendant argues, even if the court overturns the award, GSA will award the contract to [Offeror X], rather than Brooks Range.  See id. at 13.

In its Response, plaintiff for the first time discusses--but does not challenge-- the agency's evaluation of proposals.  See Pl.'s Resp. 5-8.  Plaintiff argues that, under Info. Tech., standing does not require the protestor to be "next-in-line [sic]," see Def.'s

_____

[9] This court has, on occasion, viewed the waiver issue differently.  See Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (holding that where "defendants were able to fully respond to [plaintiff's] contentions regarding permanent injunctive relief in their reply briefs, the concept of waiver announced in Novosteel is inapplicable" (citing Novosteel, 284 F.3d at 1274)); Turner Constr. Co. v. United States, 94 Fed. Cl. 586, 593 (2010) (finding that intervenor's jurisdictional argument had not been waived because plaintiff had an opportunity to respond).

Combined Mot. 8, and that, due to the high technical ratings of plaintiff's proposal, and despite its higher price, "there is very good reason to believe that [Brooks Range's] proposal would be the best value," see Pl.'s Resp. 4-6, 8. Plaintiff argues that defendant cannot rely on the TEB's relative ranking of [Offeror X] and Brooks Range because it is a "single comment made by a lower level evaluator who was not the source selection authority for this procurement." Id. at 4.

Defendant is correct that plaintiff does not challenge the agency's technical evaluation or manner of comparing offerors. See id. passim; Oral Argument of Nov. 22, 2011, Argument of Mr. Johnathan Bailey at 12:53:07-13 ("I don't challenge the assessment of those capabilities."). Instead, plaintiff argues that it had a fighting chance to obtain the award because the source selection authority (the contracting officer in this case) failed to rank all offerors, with the exception of Urban and Meridian, creating an open field among the remaining offerors. See id. at 8.[10] Plaintiff continues to point only to a single error--the one originally raised in its Complaint and in its Motion--that the agency erroneously awarded the contract to Urban and Meridian. See id. at 8-14.

---

[10] Plaintiff suggests that, were the court to overturn the award to Urban and Meridian, the agency would then be required perform a best-value tradeoff between Brooks Range Contract Services, Inc. (Brooks Range or plaintiff) and [Offeror X], permitting plaintiff to have a "substantial chance" of obtaining the award. See Pl.'s Resp. 5; FAR 15.101-1(a). However, the AR, in particular, the contracting officer's proposal analysis, shows that although Brooks Range was rated higher than [Offeror X] in three of the five technical sub-categories, [Offeror X] rated higher than Brooks Range in one of the five technical sub-categories, received Small Business Status evaluation credit and had the lowest price. AR Tab 22 (CO's Proposal Analysis) 1348; but see AR Tab 24 (TEB Report) 1355 ("Brooks . . . did not rate high enough in the technical competencies."). In such a case, all non-price evaluation factors--not just the technical factors-- would need to be considered in accordance with the Solicitation's instructions, see AR Tab 3B (Amendment 001), and then weighed against Brooks Range's higher price, see generally FAR 15.101-1(b)-(c). As the record reflects, the technical review board (TEB) analyzed Brooks Range alongside [Offeror X] on the non-price evaluation factors, and the TEB determined that the "[Offeror X] and Meridian/Urban overall ratings were more acceptable than the other offerors." AR Tab 24 (TEB Report) 1354. The TEB noted both that Brooks Range "did not rate high enough in the technical competencies"--a position that plaintiff appeared to contest at oral argument, Oral Argument of Nov. 22, 2011, Argument of Mr. Johnathan Bailey at 12:53:21-38-- and that "Brooks also rated well in the technical competencies but was a large business." AR Tab 24 (TEB Report) 1354-55. As discussed more fully in the text, the record supports the inference that the source selection authority--here, the contracting officer--agreed with the TEB's conclusion that [Offeror X] was rated higher on non-price evaluation factors taken together. AR Tab 23 (CO's Notes) 1353 ("I was in agreement with the Board's assessments of Technical Capabilities and Past Performance . . . .").

Even if plaintiff had properly alleged error in the agency's technical evaluation, plaintiff fails to establish that it had a substantial chance to obtain the award. While plaintiff need not be next in line for the award, it must have a substantial chance of securing the award if the alleged errors are found in the Administrative Record. See Info. Tech., 316 F.3d at 1319. In its Response, plaintiff argues that "the record definitely demonstrates that if the Urban/Meridian joint venture were disqualified, [Brooks Range] would have a substantial chance of receiving award if a rational best value trade[-]off is performed." Pl.'s Resp. 5. For most of its Response, however, plaintiff appears to agree with the agency's technical evaluation of both its proposal and of [Offeror X]'s proposal. See e.g., id. at 5 ("That [Brooks Range] excelled in areas where [Offeror X], as noted below, did not perform well, is shown in the specific observations made by the evaluators.").

The AR indicates that the contracting officer agreed with the TEB's assessment of the offerors' technical capabilities and past performance and with the TEB's final award recommendation. After having conducted her own evaluation, and after the TEB had conducted its own technical evaluation, the contracting officer conferred with the TEB. AR Tab 23 (CO's Notes) 1351, 1353. Her final report contains a table (reproduced below) that reformats a table originally produced in the TEB report:

| Non-price Factor | Meridian/Urban | [Offeror X] | [Offeror Y] | [Offeror Z] | BRCS |
|---|---|---|---|---|---|
| Staffing Plan | Good | Marginal | Marginal | Good | Good |
| Quality Control Plan | Exceptional | Good | Poor | Exceptional | Good |
| Leed Experience | Adequate | Marginal | Marginal | Good | Good |
| Data Center Experience | Good | Good | Adequate | Exceptional | Exceptional |
| Lab Experience | Exceptional | Good | Poor | Marginal | Adequate |
| Past Performance | Good | Adequate | Not Rated | Not Rated | Good |
| Business Size | Small | Small | Large | Small | Large |

AR Tab 22 (CO's Proposal Analysis) 1348; see also AR Tab 24 (TEB Report) 1354. Her report also contains, as part of a larger pricing summary, the following total price information for the five offerors:

| | IGE | Meridian/ Urban | [Offeror X] | [Offeror Y] | [Offeror Z] | BRCS |
|---|---|---|---|---|---|---|
| Total | $14,326,963.70 | $13,300,872.00 | $12,575,760.00 | $17,202,408.00 | $17,408,670.69 | $13,630,971.71 |
| % from IGE | | -7.2% | -12.2% | 20.1% | 21.5% | -4.9% |

Id.  The CO's notes state, "Based on this discussion [with the TEB] and review of contractor proposals, the [TEB's] recommendation, and the [TEB's] notes, I was in agreement with the Board's assessments of Technical Capabilities and Past Performance, as well as their final recommendation for award to Meridian/Urban Services, after evaluating price."  AR Tab 23 (CO's Notes) 1353.

While the TEB's evaluations may be persuasive to the contracting officer, the TEB's decision is not automatically adopted by the contracting officer.  See FAR 15.308 ("While the [Source Selection Authority (SSA)] may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment."); Cf. Portfolio Disposition Mgmt. Grp. LLC v. United States, 64 Fed. Cl. 1, 8-9 (2005) (concluding that "the [technical evaluation panel's] responsibility is to consider the findings of the [technical evaluation team], but that the development of its consensus rating . . . is arrived at independently by the voting members of the Panel").  In this case, however, the contracting officer's statements in the record indicate that it is not unreasonable to conclude that the contracting officer had similar confidence in the TEB's conclusion in its report that "[Offeror X] and Merdian/Urban overall [non-price] ratings were more acceptable than the other offerors," see AR Tab 24 (TEB Report) 1354, as she did in the TEB's ultimate award recommendation, see AR Tab 23 (CO's Notes) 1353.

A finding of standing in a post-award bid-protest case requires that the protestor have a "substantial chance" to obtain the contact if the alleged errors are found to exist. See Info. Tech., 316 F.3d at 1319.  In this case, Brooks Range has alleged no error other than that the agency erroneously awarded the contract to Urban and Meridian.  See Pl.'s Compl. passim; Pl.'s Mem. passim; Pl.'s Resp. passim.[11]  Further, if the award were in fact erroneous, it is not unreasonable to conclude, based on the AR, that the award would then go to [Offeror X] based on the agency's relative assessment of the offerors on non-price factors.[12]  See AR Tab 24 (TEB Report) 1354; AR Tab 23 (CO's Notes) 1353. Even presuming the alleged error were established, Brooks Range would not have a substantial chance to obtain the award and, therefore, lacks standing to protest.

---

[11]  On the last page of its Response, plaintiff states that "[Brooks Range] was prejudiced by this error," but this statement refers to the allegedly erroneous award to Urban and Meridian.  Pl.'s Resp. 14.

[12]  It also does not appear that it would have been unreasonable for the agency to have rated Brooks Range more favorably than [Offeror X] on its non-price factors.  See AR Tab 22 (CO's Proposal Analysis) 1348.  However, the best value context and the weighing of qualitative factors under the Solicitation permit a range of reasonable results and Brooks Range has failed to establish a "substantial chance" of award.

B.    The Contracting Officer's Decision Was Not "Arbitrary, Capricious or Contrary to Law"[13]

Even if Brooks Range were found to have standing, this court may overturn the award to Urban and Meridian only if it finds error, namely that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  Impresa, 238 F.3d at 1332.

The focus of plaintiff's Complaint and opening brief in this case is the allegation that Urban and Meridian were parties to a joint venture agreement and that a joint venture is not, unless it is itself a holder of the relevant GSA schedule contract, eligible for award under the Solicitation.  Compl. passim, Pl.'s Mem. passim.

The eligibility of a joint venture for award arose when Meridian's business development manager asked the contracting officer to comment on a joint venture between Urban and Meridian, with Urban as the majority partner, would be evaluated under Amendment 001.  See AR Tab 28 (May 17, 2011 email exchange between Tannis Taylor and Cheryl Ansaldi) 1484.[14]  That inquiry was incorporated into Amendment 002 in the following question, "Can a large business schedule holder form a joint venture with a small business schedule holder and receive small business evaluation credit?"  AR Tab 3C (Amendment 002) 230.  The agency's response stated:

> No.  A joint venture would have to be considered a separate legal entity. Even if both parties were on Schedule, the joint venture itself, would not be considered a Schedule Holder.
>
> However, a large business schedule holder may form a Contractor Teaming Agreement with a qualified small business schedule holder and receive the small business evaluation credit.  (See gsa.gov/cta)  To be considered, a copy of the Teaming Agreement must be submitted along with the proposal, and the Teaming Agreement must clearly show that the small business is taking a lead position (performing the majority of the work).

---

[13]   See MED Trends, Inc. v. United States, No. 11-712 C, 2011 WL 5970954, at *4 (Fed. Cl. Nov. 30, 2011).

[14]   The email from Meridian to the contracting officer asked, "Can you comment on how an Urban/Meridian Joint Venture proposal would be evaluated under your Amendment 1 evaluation criteria?  Urban is a small business and a minority-owned business.  The joint venture would be structured with Urban as the majority partner."  AR Tab 28 (May 17, 2011 email exchange between Tannis Taylor and Cheryl Ansaldi) 1484.

Id.

In response to the agency's advice, Urban and Meridian submitted, with their response to the Solicitation, a Teaming Agreement.  AR Tab 19 (Urban and Meridian's Proposal) 399-413.  Plaintiff's Complaint and Response analyze certain provisions of Urban and Meridian's Teaming Agreement and contend that Urban and Meridian are ineligible because certain provisions contained in the Teaming Agreement must be interpreted as creating a joint venture under Georgia law, see Compl. 5-19; Pl.'s Mem. 5-21, 25-34, and that "[t]he agency failed to properly review [the Urban and Meridian CTA]" and "failed to note that it created a joint venture in violation of Amendment 0002," Pl.'s Mem. 38-39.  (Subsequently, in its Response to defendant's Combined Motion, plaintiff also argues that the agency erred in failing to recognize Brooks Range's "clearly superior proposal."  Pl.'s Resp. 8.).

Contrary to plaintiff's assertions, the record indicates that the contracting officer acted reasonably and consistently with the Solicitation when she considered Urban and Meridian's proposal, including the draft Teaming Agreement, and when she awarded the contract to Urban and Meridian.

The Solicitation identified only two prerequisites in order for "a large business schedule holder [to] form a Contractor Teaming Agreement with a qualified small business schedule holder and receive the small business evaluation credit."  AR Tab 3C (Amendment 002) 230.  First, the team must submit a copy of its teaming agreement along with its proposal.  See id.  Second, the "Teaming Agreement must clearly show that the small business is taking a lead position (performing the majority of the work)."  Id.

Urban and Meridian submitted an unsigned draft of their Teaming Agreement with their proposal.  AR Tab 19 (Urban and Meridian's Proposal) 399-413.  Urban and Meridian subsequently submitted an executed copy of their Teaming Agreement, signed on June 28, 2011, a document substantially identical to the unsigned draft version.  AR Tab 3E (executed CTA) 260.  Both iterations of the Teaming Agreement were titled "Urban Services Group, Inc./Meridian Management Corporation Teaming Agreement." AR Tab 19 (Urban and Meridian's Proposal) 399 (emphasis added); AR Tab 3E (executed CTA) 249 (emphasis added).  The draft agreement was twelve pages long, not including a signature page and two pages of appendices, see AR Tab 3D (draft CTA); the executed agreement was eleven pages long, not counting the signature page and the two appendices, see AR Tab 3E (executed CTA).  Both the draft and the executed copy of the Teaming Agreement make it immediately clear that Urban--the small business--would be taking the lead, that is, "performing the majority of the work" as required by the Solicitation.  See AR Tab 3D (draft CTA) 246; AR Tab 3E (executed CTA) 261.  Page two of the Teaming Agreement points the contracting officer to Appendix A of the CTA,

which shows that Urban would be responsible for all tasks and performing the majority of the work.  AR Tab 3D (draft CTA) 234; AR Tab 3E (executed CTA) 250.  Meridian, the large business, was also responsible for some but not all the tasks listed.  AR Tab 3D (draft CTA) 234; AR Tab 3E (executed CTA) 250.

The contracting officer conducted the initial review of the proposals and "checked for responsiveness."  AR Tab 23 (CO's Notes) 1351.  Her review included a determination of which offerors would receive small business evaluation credit.  Id. at 1352.  She noted that "[Urban and Meridian's] proposal included a Contractor Teaming Agreement that conformed to the requirements provided via website link and Q&A verbiage in amendment 002," and stated that she instructed the TEB to give Urban and Meridian small business evaluation credit.  Id.

Plaintiff's challenge to the award is that the CO did not recognize that Urban and Meridian's teaming agreement also contained features of a joint venture agreement under Georgia law, and that the CO therefore awarded the contract to a joint venture that was not a schedule holder in violation of the Solicitation.  Pl.'s Mem. 24-34.

Plaintiff's contention is grounded in plaintiff's view that a contracting officer is required to analyze a document styled a Teaming Agreement and undertake a rigorous legal comparison between its terms and the terms of agreements that have been determined to constitute joint ventures under Georgia law.[15]  Plaintiff argues, in essence, that the CO was required to determine whether a document that called itself a "teaming agreement," nowhere contained the words "joint venture" and satisfied the Solicitation's requirements for CTAs was in fact a joint venture under Georgia state law.  See AR Tab 3D (draft CTA); AR Tab 3E (executed CTA); Pl.'s Resp. 12 (arguing that after having incorporated Amendment 002 into the Solicitation, "[f]or Defendant to say that it was unreasonable to expect that the Contracting Officer would make an effort to make sure that the entity it was awarding to was not a joint venture defies logic and the plain Solicitation language").  Plaintiff's Complaint and opening brief, in dozens of pages, provide examples of the analysis that plaintiff contends that the CO should have undertaken.  Compl. 5-19; Pl.'s Mem. 4-20, 25-34.

For instance, plaintiff points to language appearing on page three of the draft CTA and the executed CTA, AR Tab 3D (draft CTA) 235; AR Tab 3E (executed CTA) 251, that states:

---

[15]  The final page of the draft CTA and the executed CTA states, "This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Georgia."  AR Tab 3D (draft CTA) 244; AR Tab 3E (executed CTA) 259.

> Each member of the Management Committee shall have one vote, on behalf
> of the Team which he/she represents, and all decisions will be unanimous
> . . . .  Neither Urban nor Meridian by itself, shall have any power or
> authority to act or make decisions on behalf of the other member, or to
> incur obligations or commitments binding the other member.

Pl.'s Mem. 8 (capitalization omitted), and to similar language found later in the
agreement on pages seven and eight, id. at 14-15; AR Tab 3D (draft CTA) 239-40; AR
Tab 3E (executed CTA) 255-56.  Plaintiff argues that the provisions "unmistakably
provide[] the 'rights of mutual control' that mark a joint venture under Georgia law."
Pl.'s Mem. 8.  Relying on Georgia common law regarding joint ventures, plaintiff
endeavors to show that "the Urban/Meridian agreement is a 'joint venture' under Georgia
law because it does in fact provide for rights of mutual control."  Id. at 31; see generally
id. at 30-33.

        Plaintiff also directs the court to language that appears on page eight of both the
draft CTA and the executed CTA, AR Tab 3D (draft CTA) 240; AR Tab 3E (executed
CTA) 256, providing that "[a]ll assets and property owned by the Team . . . shall be held
and recorded in the name of the Team, and purchased by the Team with Urban paying
51% and Meridian paying 49% of that sum in cash."  Pl.'s Mem. 16.  Plaintiff argues,
"This is an essential feature of a joint venture," id., and supports its contention by
providing citations to GAO decisions and decisions from the Court of Claims, id. at 26-
29.  For example, plaintiff explains that "the GAO itself has observed in several cases:
'A joint venture is an association of persons or firms with an intent, by way of contract,
to engage in or carry out a single business venture for joint profit for which they combine
their efforts, property, money, skill and knowledge."  Id. at 26 (quoting, inter alia, T.V.
Travel, Inc., 65 Comp. Gen. 109 (1985)).

        Plaintiff's proposed approach to document review by a contracting officer
awarding a task order appears to the court to be unrealistic in view of the well-known
burdens on contracting officers.  In 2007, the federal government reported nearly four
million procurement actions by more than sixty agencies, including the Department of
Defense, the Department of Agriculture and the National Science Foundation.  Global
Computer Enterprises, Inc., Federal Procurement Report FY 2007, at 10-11 (reporting a
total of 3,973,578 procurement actions across 62 agencies during the 2007 fiscal year).
In 2007, there were 28,434 contracting employees in the federal workforce.  Federal
Acquisition Institute, FY 2009 Annual Report on the Federal Acquisition Workforce 7.

        Nor does the court conclude that the contracting officer was required to follow
plaintiff's suggestion--only made at oral argument--that, because contracting officers
have ready access to their agency's legal department, the contracting officer or other

agency personnel should have analyzed the CTA under the law of Georgia to determine whether or not it was a joint venture.  Plaintiff's counsel states:

> I give procurement officials a little more credit than defendant and intervenors are giving them.  Joint venture proposals are submitted all the time.  Contracting officers are called upon to look even at prime-sub proposals, and decide for themselves are these legitimate primes and subs or are they not.  The contracting official is given the power to file size protests for that very reason . . . .  That agreement is a joint venture agreement under the law of all fifty states . . . this is not a hypertechnical question.  Furthermore, . . . Urban/Meridian itself said, "We would like to propose a joint venture--can we do it?"  The CO specifically consulted with her legal counsel on that issue and said, "No, unless your joint venture has its own schedule contract."

Oral Argument of Nov. 22, 2011, Argument of Mr. Johnathan Bailey at 1:32:25-33:43. This argument is unpersuasive, however, because it presupposes that the contracting officer--after viewing a document that calls itself a "Teaming Agreement," that nowhere contains the word "joint venture," and that satisfied the Solicitation's requirements for a CTA--would have recognized a potential legal issue:  that some of the CTA's provisions resemble provisions in agreements found to have created joint ventures under Georgia (or even another jurisdiction's) case law.  Cf. Pl.'s Mem. 4-21, 25-34; Pl.'s Resp. 9 (citing cases from Georgia state courts and also citing cases from Louisiana state courts, Louisiana federal district courts and the United States Court of Appeals for the Fifth Circuit).

Even if plaintiff were able to show standing, the court is simply not persuaded that the actions of the contracting officer in this case were arbitrary, capricious, or contrary to law.[16]

---

[16]  Plaintiff argues that Urban and Meridian's CTA violates GSA requirements found on the agency's website, Pl.'s Mem. 35-39, for example, that the CTA omits certain of "GSA's required elements of a CTA," id. at 35.  Plaintiff's contention is incorrect.

The language that plaintiff refers to is permissive.  See Def.'s Mot. to Dismiss, Cross-Mot. for J. upon the Administrative Record, and Resp. to Pl.'s Mot. for J. upon the Administrative Record (Def.'s Combined Mot.), Dkt. No. 27, at 23-24, filed November 15, 2011. For example, the relevant GSA guidance provides in part, "The CTA document should state that all team members remain independent contractors, responsible for their own employees," AR Tab 3I (GSA Online Guidance) 283, available at http://www.gsa.gov/portal/content/202253 (emphasis added), an item of permissive guidance that plaintiff characterizes as "required," Pl.'s Mem. 35.  This guidance is prefaced by the statement:

>       Contractor Team Arrangement (CTA) documents are developed by the team
>       members themselves and will vary from one CTA document to another.  While
>       not all-inclusive, the following CTA elements are areas that are typically of
>       interest to the government.  GSA strongly encourages the submission of the CTA
>       document in response to a Request for Quotation (RFQ) so that an ordering
>       activity may gain an understanding of how the arrangement will work, and may
>       identify any areas of responsibility that may require clarification.

AR Tab 3I (GSA Online Guidance) 283.

There are only four elements on GSA's website (also included in GSA's Multiple Award Schedules Desk Reference (Desk Reference), see MAS Desk Reference) that could possibly be construed as CTA "requirements," see Pl.'s Mem. 35; Ints.' Cross-Motion for J. on the Administrative Record (Ints.' Cross-Mot.), Dkt. No. 28, at 10, filed November 15, 2011.  The website states: (1) "Each team member must have a GSA Schedule contract," (2) "Each team member is responsible for duties addressed in the CTA document," (3) "Each Team member has privity of contract with the government and can interact directly with the government," and (4) "The ordering activity is invoiced at each team member's unit prices or hourly rates as agreed in the task or delivery order or GSA Schedule BPA."  AR Tab 3I (GSA Online Guidance) 282; see also MAS Desk Reference 78.  Notwithstanding their mandatory phrasing, the four elements are not contained in a document providing mandatory requirements for offerors.  They are instead found on GSA's website and in GSA's MAS Desk Reference, a guidance manual primarily dedicated to providing tips to contracting officers overseeing schedule procurements.  MAS Desk Reference, Preface.

Moreover, plaintiff does not contest that the four elements appearing in the Desk Reference have been met by the awardee.  Pl.'s Mem. passim; Pl.'s Resp. passim.  And whether or not Urban and Meridian's CTA adhered perfectly to GSA's permissive online guidance, the CTA does not appear to violate any GSA requirements.

This case should serve as a caution to agencies and draftspersons alike.  The court observes along with plaintiff that "[t]here is no FAR or GSAM FAR supplement regulation that actually provides any definition of what a CTA is and what its elements must be.  There is only [GSA's] website."  Pl.'s Resp. 10.  Indeed, in order to find an example of a CTA that clearly avoids a possible interpretation as a joint venture or other "formal business arrangement," plaintiff needed to go back to the A-12 litigation concerning a Navy program to develop attack aircraft, which began in the 1980s.  See Pl.'s Mem. 28-29 (citing McDonnell Douglas Corp. v. United States (McDonnell Douglas), 25 Cl. Ct. 342 (1992).  In that case, the teaming agreement stated:

>       This Agreement does not constitute and shall not be construed or given effect as a
>       joint venture, partnership, pooling arrangement, or other formal business
>       organization, or as creating any fiduciary relationship.  Except as expressly

26

IV.     Conclusion

For the foregoing reasons, plaintiff's Motion is DENIED and defendant's Combined Motion and intervenors' Cross-Motion are GRANTED.  The Clerk of Court shall DISMISS the Complaint for lack of subject matter jurisdiction.  Judgment shall be entered for defendant.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

provided herein, nothing herein shall be construed as providing for the sharing of profits or loss, nor shall either Party be liable to the other for any of the costs, expenses, risks, or liabilities arising out of the other's activities in connection with the performance of programs outside this agreement.

McDonnell Douglas, 25 Cl. Ct. at 344 (emphasis omitted).